UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| MICHAEL TOMICK, | : | |
|---|---|---|
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:06-cv-1660(VLB) |
| UNITED PARCEL SERVICE, INC., and | : | |
| KEVIN TRUDELLE, | : | |
| Defendants. | : | September 25, 2007 |

# MEMORANDUM OF DECISION
# RE: MOTION TO DISMISS, DOC. NO [16].

On December 6, 2006, the defendants, United Parcel Service, Inc., ("UPS") and UPS supervisor Kevin Trudelle, filed a motion to dismiss counts one, two, three and seven of the plaintiff Michael Tomick's complaint on the ground that the counts fail to state a claim for which relief can be granted. Tomick filed his opposition memorandum on December 27, 2006. The case was transferred to this court on July 2, 2007.

This action arises from the events leading to Tomick's termination by UPS after nearly twenty years of employment. Counts one and two allege common law claims of negligent infliction of emotional distress and intentional infliction of emotional distress, respectively. Counts three and seven allege violations of Connecticut General Statutes § § 31-51x and 46a-60(a)(1), respectively.

The complaint alleges that in 1984 UPS hired Tomick as a driver. In January 2003, Tomick injured his back and was unable to work while recuperating from that injury. Although he was diagnosed with fifteen percent

permanent partial disability, his doctor released him to return to work. UPS agreed, as part of a "reasonable accommodation," to supply Tomick with a driver's helper upon his return.

On December 2, 2004, presumably his first day back at work, Tomick expected, but UPS did not provide, a driver's helper. Nevertheless, he commenced his delivery route. He began feeling "intolerable" back pain, at which point he called his wife. Thereafter he called UPS to report that he was unable to complete his delivery route, that he needed to see his physician, and that he was going to drive the UPS truck, which was presumably stocked with the undelivered customer packages, to his home. Tomick alleges that UPS later called his home and left a message for Tomick to return the truck that afternoon. Tomick did so and a confrontation ensued.

Tomick asked his supervisors why he was not given a driver's helper. Trudelle accused him of acting "irrationally." Trudelle then suggested Tomick was under the influence of drugs and alcohol and insisted that Tomick be immediately driven to a drug testing clinic and submit to a substance abuse test. Refusing, Tomick countered that he needed to see his physician immediately. He attempted to leave, but Trudelle and fellow supervisor Ray Congdon prevented him from getting into his vehicle. Tomick accused Trudelle of verbally abusing his wife and threatened him.[1]

---

[1] Tomick's wife, after being notified that her husband was leaving his route to come home, called UPS to find out why he had not received a helper. Trudelle purportedly responded to her "in a harsh and abusive tone."

Trudelle accused Tomick of workplace violence and threatened to terminate Tomick if Tomick did not submit to an immediate fitness-for-duty observation, including a controlled substance test, at UPS' testing facility. Tomick agreed on the condition that the test be performed at his hospital where he could simultaneously receive treatment from his physician for his back pain. Trudelle rejected this condition and terminated Tomick. Congdon interceded and everyone agreed that the evaluation could be performed at Tomick's hospital. The two men traveled together to the hospital.

During the fitness-for-duty observation, the physician characterized Tomick as a "pleasant man, cooperative, and alert." The doctor concluded that a physical drug test was unnecessary and declared Tomick fit for work.[2] The doctor did, however, prescribe pain medication.

The next day, Tomick returned to work, whereupon he was called into a meeting with Trudelle, fellow supervisor Victor Birch and union steward John Fitzgerald to discuss the events. Trudelle asked Tomick to submit to a controlled substance test. Tomick agreed. The supervisors then left the room, returned several minutes later, and fired Tomick for engaging in workplace violence the previous day. Tomick filed this action.

## DISCUSSION

In deciding a motion to dismiss, the allegations of the complaint are

---

[2] **Paragraph 34 of the complaint alleges that Tomick could return to work at a "modified duty status."**

accepted as true and are construed in a light most favorable to the plaintiff. *Almonte v. City of Long Beach*, 478 F.3d 100, 104 (2d Cir. 2007). A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974).

### I. Negligent Infliction of Emotional Distress

The defendants assert that count one should be dismissed because "none of the distressful activity occurred during the termination of Plaintiff's employment." Both parties agree that a negligent infliction of emotional distress claim, arising from an employer-employee relationship, must stem from the "termination process" instead of an "ongoing employment relationship." *Perodeau v. Hartford*, 259 Conn. 729, 792 A.2d 752 (2002). "[A] termination may give rise to a claim for negligent infliction of emotional distress if the conduct under review involved an unreasonable risk of . . . emotional distress . . . that . . . might result in illness or bodily harm. . . . Implicit in this conclusion is a recognition that emotional distress that might result in illness or bodily harm is a foreseeable consequence of particularly egregious conduct involving a

termination, which would, in turn, give rise to a duty to avoid such conduct."
(Citation omitted; internal quotation marks omitted.) *Id.* at 754-55.

The focus is on "the manner of the discharge, whether the employer's conduct in the termination process was unreasonable, not whether the termination itself was unreasonable." (Internal quotation marks omitted.) *Storm v. ITW Insert Molded Products*, 400 F. Supp. 2d 443, 449 (D. Conn. 2005). "The Connecticut Supreme Court has not specifically ruled on the temporal boundaries of the termination process. However, the reasoning in *Perodeau* makes clear that this process does not begin . . . at the action that causes the employer-employee relationship to deteriorate." (Internal quotation marks omitted.) *Mody v. General Electric Co.*, No. 04-358 (JCH), 2006 U.S. Dist. LEXIS 24439, at *11(D. Conn. April 26, 2006).

Viewing the facts in a light most favorable to Tomick, the "termination process" arguably began when Trudelle first threatened to fire Tomick. Thus, the court looks to the defendants purported behavior succeeding this occurrence. After Trudelle threatened to fire Tomick, he and fellow supervisor Congdon physically prevented Tomick from getting into his vehicle and seeking medical treatment for his back. Trudelle again threatened to fire Tomick if he did not submit to a fitness-for-duty evaluation and then argued with Tomick over where the fitness-for-duty evaluation should take place. The next morning Trudelle made Tomick rehash the preceding events in a meeting and gave him the ultimatum to either undergo another evaluation or be terminated. Despite

Tomick's acquiescence to these terms, he was fired.

At first blush, the complaint does not allege conduct so egregious as to create an unreasonable risk of emotional distress of which the foreseeable consequence was illness or bodily harm.  Drug testing is not an uncommon or unwarranted condition of employment, particularly for a person whose duties include driving a company-owned motor vehicle.  Tomick's abrupt and unorthodox plan to abandon his route and take home a UPS truck, presumably containing customer merchandise, rather than immediately returning the truck to the UPS depot before going to his doctor also lends credence to UPS' concern about Tomick's fitness for duty.  Even more validating, Tomick was belligerent and threatening when he returned to the depot.  Under those circumstances, it was not unreasonable for UPS to insist that Tomick submit to an immediate drug test and to take steps to prevent Tomick from operating a motor vehicle until his condition was assessed.  Detaining him for that purpose would not constitute egregious conduct reasonably foreseeable to result in injury.  Moreover, it did not in fact result in emotional distress.  Shortly after the incident, his doctor described Tomick as pleasant, cooperative and alert, not in emotional or physical extremis.  In addition, his doctor pronounced him fit to work, albeit at a "modified duty status," and did not prescribe any pharmacological, mental health or other therapeutic treatment for emotional distress.  The doctor prescribed pain killers and muscle relaxants, a fact which makes UPS' drug testing requirements more reasonable.  Since Tomick was prescribed pain medication, it is even less

foreseeable that the subsequent request for submission to a drug test would cause Tomick any harm. Finally, Tomick cited no misconduct in connection with the meeting with Trudelle's supervisor and Tomick's union representative in which he was given an opportunity to explain what happened from his perspective.

On the other hand, it is not beyond any doubt that UPS' seemingly justifiable conduct could have been executed in an injurious manner. In the midst of Tomick's "intolerable" back pain and despite his insistence that he needed immediate medical attention, his superiors prevented him from leaving and threatened to terminate him. The supervisors' restriction of Tomick's efforts to seek treatment for a known back condition could pose an unreasonable risk of emotional distress and bodily harm or injury.

The true nature of the conduct at issue can only be discerned by the trier of fact having the benefit of seeing and hearing all of the evidence presented in a court of law. The motion to dismiss is denied.

## II. Intentional Infliction of Emotional Distress

The defendants argue that this claim for relief should be dismissed because their conduct was neither "extreme" or "outrageous" enough to sustain the action. "In order for the plaintiff to prevail in a case for liability under . . . [intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his

conduct; . . . (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." (Internal quotation marks omitted.) *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 442-443, 815 A.2d 119 (2003).

"In the employment context, it is the employer's conduct, not the motive behind the conduct, that must be extreme or outrageous. . . . Routine employment action, even if undertaken with improper motivations . . . does not constitute extreme or outrageous behavior." (Citations omitted; internal quotation marks omitted.) *Sousa v. Roque*, No. 3-05CV822 (JCH), 2005 U.S. Dist. LEXIS 35885 (D. Conn. December 16, 2005). "Whether the defendant's conduct was extreme and outrageous is initially a question for the court to address. . . . Only where reasonable minds disagree does it become an issue for the jury." (Internal quotation marks omitted; citation omitted.) *Balsamo v. Finkle*, No. 06-1325 (JCH), 2007 U.S. Dist. LEXIS 36052, at *6 (D. Conn. May 17, 2007) citing *Appleton v. Board of Education*, 254 Conn. 205, 210, 757 A.2d 1059 (2000).

Unlike the claim for negligent infliction of emotional distress, the claim for intentional infliction of emotional distress is not confined to acts committed during the termination process. Taking Tomick's allegations as true, reasonable minds may differ as to whether the defendants' decision to renege on its promise to provide a helper and knowingly send Tomick on a physically demanding route while also knowing of his back injury and resulting permanent partial disability

could constitute "extreme and outrageous" behavior. The court recognizes that the test for what constitutes "extreme and outrageous" is a stringent one,[3] but the defendants, as employers, subjected Tomick to unsafe working conditions which resulted in an exacerbation of his back condition and extreme physical pain to him. It is not unreasonable to conclude that such physical pain manifested into emotional distress felt by Tomick. At this stage in the proceedings, the court will not dismissed this count.

### III. Connecticut General Statutes, § 31-51x

UPS moves to dismiss count three on the ground that Tomick failed to allege a claim under Connecticut General Statues § 31-51x. Section 31-51x provides, in relevant part:

> (a) No employer may require an employee to submit to a urinalysis drug test unless the employer has reasonable suspicion that the employee is under the influence of drugs or alcohol which adversely affects or could adversely affect such employee's job performance. . . .
>
> (b) Notwithstanding the provisions of subsection (a) of this section, an employer may require an employee to submit to a urinalysis drug test

---

[3] "Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society . . . . Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous! . . . . Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." (Citations omitted; internal quotation marks omitted) *Carrol v. Allstate Ins. Co.*, Id. at 443 (Conn. 2003).

on a random basis if (1) such test is authorized under federal law, (2) the employee serves in an occupation which has been designated as a high-risk or safety-sensitive occupation pursuant to regulations adopted by the Labor Commissioner pursuant to chapter 54, or (3) the urinalysis is conducted as part of an employee assistance program sponsored or authorized by the employer in which the employee voluntarily participates.

UPS maintains that an actual urinalysis drug test must have been conducted before this statute can form the basis for an action. Connecticut courts, however, have interpreted the statute otherwise. See *Schmidt v. Southern New England Tele. Co.*, Superior Court, judicial district of New Haven at Meriden, Docket No. CV064005514 (*Taylor, J.*, November 1, 2006) ("The cause of action . . . arises from the act of requiring drug testing and not the act of terminating [the employees'] employment." Whether an employer fires an employee for failure to undergo the drug test or for unfavorable results after taking the test is immaterial in assessing the employer's requirement of drug testing. Further, to hold that drug testing must be conducted prior to bringing an action against an employer contravenes the public policy behind § 31-51x, namely, protecting the privacy rights of employees. See *Doyon v. Home Depot U.S.A., Inc.*, 850 F. Supp. 125, 130 (D. Conn. 1994).

In this case, UPS required Tomick to submit to a drug test at a drug testing center. Under threat of termination he agreed to submit, provided that the test was conducted in a place where his back injury could be treated. The following day he was again ordered to submit to a drug test and he agreed without qualification. Consent to a drug test under threat of termination has been found

to be involuntary and thus not a waiver of the right to assert a violation of § 31-51 (x) Id. "[A choice between discharge or submitting to a drug test] is tantamount to no choice at all . . . ." Id. It follows that if consent to a drug test could waive an individual's rights to bring an action, then refusing to take a drug must preserve those rights.

Viewing the facts in a light most favorable to Tomick, the complaint alleges facts sufficient to support a claim of a violation of § 31-51x of the Connecticut General Statutes. Accordingly, the motion to dismiss count three is denied.

### IV. Perceived Disability under Connecticut General Statutes § 46a-60(a)(1)

UPS asserts that Connecticut law does not recognize a claim for "perceived disability" under Connecticut General Statutes § 46a-60(a)(1).[4] In support, they rely on *Beason v. United Techs. Corp.*, 337 F.3d 271, 279 (2d Cir. 2003), wherein the court unambiguously concluded "that no cause of action for perceived disability discrimination presently exists under Connecticut law." Tomick contends that the Connecticut supreme court implicitly recognized this cause of action in *Ann Howard's Apricots Rest. v. Comm'n on Human Rights & Opportunities*, 237 Conn. 209, 676 A.2d 844 (1996) ("*Ann Howard's Apricots*

---

[4] **Section 46a-60(a)(1) provides: "It shall be a discriminatory practice in violation of this section: (1) For an employer, by the employer or the employer's agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disability, mental retardation, learning disability or physical disability, including, but not limited to, blindness . . . ."**

*Rest.*").

In *Ann Howard's Apricots Rest.*, the "principal issue on appeal is whether the trial court properly determined that a hearing officer for the commission on human rights and opportunities had abused her discretion in failing to strike the direct testimony of a defendant who died before he could be fully cross-examined." The court did not decide whether there is a cause of action in Connecticut of perceived disability discrimination. The court, did, however, discuss the hearing officer's findings, which may have included a finding of perceived disability. [5]

The language on which Tomick relies is dicta. The Connecticut Supreme Court has not expanded the legislatively created rights codified in General Statues §46a-60 (a)(1), notwithstanding its recognition, stated in the form of dicta, of the limits of the law. Moreover, the Connecticut General Assembly has not chosen to expand those rights that act although its limitation has been pointed out by the supreme court.

---

[5] On page 216, the court stated that "the hearing officer first determined that Doe had established a prima facie case of discrimination based on a physical disability *or the perception of a physical disability* . . . ." (Emphasis added.) The court further provided that "in this case, the hearing officer concluded that Doe had established that the plaintiff, on the basis of its belief *or perception* that Doe had AIDS." (Emphasis added.) Id. at 224. More persuasive than the court's recapitulation of the hearing officer's findings, is the court's affirmation of the reasonableness of the hearing officer's conclusions: "From the testimony of Quinn and other employees of the plaintiff, the hearing officer could have reasonably concluded that *Quinn had perceived Doe* to be suffering from AIDS . . . ." (Emphasis added.) Id. at 227.

**Accordingly, count seven is dismissed and counts one, two and three remain.**

**IT IS SO ORDERED.**

_____/S/_____

**Vanessa L. Bryant**

**United States District Court Judge**